UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA
                                 :
           - v. -                      09 Civ. 1183 (DAB)
                                 :     04 Cr. 472 (DAB)
JAMES GILMORE,
                                 :
           Defendant.
                                 :
- - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION
TO JAMES GILMORE'S MOTION TO SET ASIDE OR CORRECT HIS SENTENCE**



                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              One St. Andrew's Plaza
                              New York, New York 10007


JUSTIN ANDERSON
Assistant United States Attorney
      -Of Counsel-

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendant's motion pursuant to Title 28, United States Code, Section 2255 to vacate, set aside or correct his sentence.  For the reasons set forth below, the defendant's motion lacks merit and should therefore be denied.

## BACKGROUND

**A.    The Fraud Scheme and the Threat**

Beginning in 2002, James Gilmore, the defendant, created and operated a large-scale bank fraud scheme involving checks and blank check paper that were stolen from the New York City Employees' Retirement System ("NYCERS").  In or about the summer of 2002, Gilmore asked his friend Billy Duc whether Duc could get checks for Gilmore to deposit. (PSR ¶ 22).  In response, Duc introduced Gilmore to Frank Jimenez, who worked as a clerk in NYCERS' mail room.  (PSR ¶ 22).  Intermittently over the next two years, Jimenez stole checks from NYCERS, which he passed to Duc, who, in turn, delivered the checks to Gilmore. (PSR ¶¶ 22-24).  Gilmore then altered the checks by adding the name of an accomplice account holder as a payee, endorsed the checks with the false payee's name, arranged for the checks to be deposited into accomplices' accounts, supervised the accomplice

1

account holders as they withdrew money drawn on the checks, and then took his share of the proceeds.  (PSR ¶¶ 23-24).

In or about August 2003, after Gilmore served approximately six months in prison for a state probation violation, Duc gave Gilmore a box full of blank NYCERS check paper.  (PSR ¶¶ 27-28).  Gilmore used the blank check paper to create counterfeit NYCERS checks, which he also tried to deposit.  (PSR ¶ 29, 39).  The total intended loss attributable to the NYCERS fraud scheme approached $1 million.  (PSR ¶¶ 31, 44).

In or about February 2004, after the New York City Police began investigating Gilmore's scheme, Gilmore, accompanied by several of his friends, approached one of his accomplice account holders and asked whether the accomplice had been questioned by the police.  He instructed the accomplice not to cooperate with law enforcement and threatened to harm her if she did.  (PSR ¶¶ 32, 39).

On March 13, 2004, Gilmore was arrested on a complaint charging him with conspiracy to commit bank fraud, bank fraud, and witness tampering.

## B.   The Information and Gilmore's Guilty Plea

Information 04 Cr. 472 (DAB) (the "Information") was filed on May 24, 2004, in four counts.  Count One charged Gilmore with conspiring to commit bank fraud, in violation of Title 18,

2

United States Code, Section 371.   Count Two charged Gilmore with

committing bank fraud, in violation of Title 18, United States

Code, Sections 1344 and 2.   Count Three charged Gilmore with

threatening a witness, in violation of Title 18, United States

Code, Section 1512(a)(2)(C) and (3)(C).   Count Four charged

Gilmore with illegally possessing an unregistered firearm, in

violation of Title 26, United States Code, Sections 5845(a) and

(e), 5861(d), and 5871.

     Gilmore pleaded guilty to all four counts of the

Information on May 24, 2004.[1]

     Gilmore's guilty plea was entered pursuant to a

cooperation agreement (the "Cooperation Agreement") with the

Government.   Among other obligations, the Cooperation Agreement

provided that Gilmore

> (a) shall truthfully and completely disclose all
> information with respect to the activities of himself
> and others concerning all matters about which this
> Office inquires of him, which information can be used
> for any purpose; . . . (c) shall attend all meetings at
> which this Office requests his presence; . . . (e)
> shall truthfully testify before the grand jury and at
> any trial and other court proceeding with respect to
> any matters about which this Office may request his
> testimony; (f) shall bring to this Office's attention

---

[1] After Gilmore's plea but prior to sentencing, the Government
concluded that the gun that Gilmore pleaded guilty to possessing
was not required to be registered under Title 26, United States
Code, Sections 5845(a) and (e), 5861(d), and 5871. Accordingly,
at the Government's request, the Court dismissed Count Four at
sentencing.

all crimes which he has committed. . . and (g) shall commit no further crimes whatsoever.

(Cooperation Agreement at 3).[2]

After his guilty plea, Gilmore was released on bail pending sentencing, subject to, among other conditions, strict pretrial supervision by the Department of Pretrial Services. (04 Cr. 472 Docket No. 12).

## C.   Gilmore's Noncompliance with the Cooperation Agreement

In September 2005, the Government advised Gilmore that his testimony would be needed in an October trial of Peter John and Billy Duc, two of Gilmore's co-conspirators in the NYCERS scheme, before then U.S. District Judge Gerard E. Lynch.  When the Government requested meetings with Gilmore in order to prepare him for trial, however, Gilmore refused.  Indeed, on or about September 19, 2005, Gilmore advised the Government, through his attorney, that he did not wish to testify.  At the Government's request, Magistrate Judge Andrew J. Peck remanded Gilmore on or about September 22, 2005, pursuant to the terms of Gilmore's Cooperation Agreement.

During the following week, Gilmore eventually changed his mind and agreed to meet with the Government.  In the course of these meetings, Gilmore claimed, despite his prior

_____

[2] A copy of the Cooperation Agreement is annexed to this Memorandum as Exhibit A.

representations, that he could not remember certain details about the participation of John and Duc, his co-conspirators, in the NYCERS fraud.  In addition, Gilmore admitted that, over the summer, he had been in contact with John and Duc, as well as cooperating witness Kenson Hunte, in defiance of the express instructions of the Government not to contact his co-conspirators.  Gilmore also admitted that he felt bad about cooperating because doing so violated the "code of silence of the streets."[3]  Gilmore eventually agreed to testify truthfully, and allowed himself to be prepared as a trial witness at the Metropolitan Detention Center on the eve of trial.

Gilmore testified at the trial of John and Duc. Although the jury deadlocked on a charge of bank fraud, on or about October 14, 2005, the jury convicted both John and Duc of conspiracy to commit bank fraud.

## D.    The Discovery of Gilmore's Additional Misconduct

On or about November 14, 2005, the Government met with cooperating witness Kenson Hunte concerning another matter about which Hunte claimed to have information.  Hunte informed the Government that his girlfriend and another friend had been

---

[3] Gilmore repeated this view during his testimony before Judge Lynch.  (Oct. 5, 2005 Tr. at 152:19).  An excerpt from the transcript of Gilmore's testimony is annexed to this Memorandum as Exhibit B.

involved in a fraud at Chase Manhattan Bank ("Chase"), and Hunte offered to cooperate against them.  The NYPD detective investigating the fraud at Chase provided the Government with a grainy surveillance photograph of another suspect in the investigation.  Hunte was shown this photograph, and he recognized the individual depicted in the photograph as James Gilmore.

In light of Hunte's identification of Gilmore as one of the detective's suspects, the Government met with Gilmore. During this meeting, the Government questioned Gilmore about whether he had engaged in any additional fraudulent conduct while on bail that he had not disclosed to the Government, in particular, during the month of February 2005.  Gilmore hesitated, but, after conferring with counsel over the telephone, eventually admitted the following:

> (1)  During the winter of 2005, Kenson Hunte approached Gilmore and provided him with several fraudulently procured bank account numbers.  Hunte asked Gilmore to help him make fraudulent wire transfers from these accounts, and Gilmore did so, making roughly four transfers of approximately $9,000 each.  Gilmore and Hunte shared the proceeds together and with others.

> (2)  During July 2005, Gilmore provided Hunte with Social Security Numbers that he had stolen in the past and had saved.  Hunte, through another accomplice, was able to use the Social Security Numbers to access bank accounts.  Hunte then recruited at least one other person to make one or more fraudulent withdrawals from

the compromised accounts totaling between $6,000 and $9,000.

(PSR ¶¶ 14, 83-84).

When asked why he failed to disclose this additional criminal conduct previously, Gilmore remained silent.  When asked whether he had failed to disclose any other misconduct, Gilmore answered that he had not.  When asked whether he had testified truthfully at trial about the involvement of John and Duc in the NYCERS scheme, Gilmore stated that he had.

## E.   The Consequences of Gilmore's Misconduct

After learning of Gilmore and Hunte's further criminal conduct, the Government disclosed Gilmore's admissions to counsel for John and Duc and to Judge Lynch.  Both John and Duc filed new-trial motions pursuant to Rule 33 of the Federal Rules of Criminal Procedure based on the Government's failure to disclose earlier the additional criminal conduct of Gilmore and Hunte. The Government opposed both motions, arguing that the information was merely cumulative impeachment material that would not have changed the jury's verdict.

On March 1, 2006, Judge Lynch granted Duc's Rule 33 motion and denied John's motion.  Judge Lynch concluded that Gilmore's testimony against Duc was a crucial part of the Government's case, and that the additional evidence of misconduct

7

against Gilmore might have had a material effect on the verdict. Judge Lynch also imputed constructive knowledge of Gilmore's additional misconduct to the Government, reasoning that, had the Government looked earlier into Hunte's February 2005 arrest, it would have inevitably learned of Gilmore's misconduct. Accordingly, Judge Lynch concluded that Duc merited a new trial.

The Government chose not to re-try Duc.  Instead, Duc and the Government entered into a deferred prosecution agreement during the summer of 2006, the terms of which Duc subsequently fulfilled.

**F.   The Sentencing Proceedings**

**1.   The Government's Decision Not To Move for a Downward Departure Pursuant to Section 5K1.1 of the Sentencing Guidelines**

Because Gilmore continued to engage in criminal conduct after entering into the Cooperation Agreement with the Government, the Government advised Gilmore that it was not going to move for a downward departure, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 5K1.1.  Gilmore did not challenge the Government's decision.

**2.   The Presentence Investigation Report**

In anticipation of Gilmore's sentencing, the United States Probation Office calculated Gilmore's applicable Sentencing Guidelines range as follows:

(1)   The base offense level for Gilmore's bank fraud related crimes was seven, pursuant to U.S.S.G. § 2B1.1(a)(1).

(2)   Because the intended loss amount was more than $400,000 but not more than $1,000,000, the offense level was enhanced by fourteen levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(H).

(3)   Because Gilmore was an organizer and leader of criminal activity that involved five or more participants and was otherwise extensive, the offense level was increased by four levels, pursuant to U.S.S.G. § 3B1.1(a).

(4)   Because Gilmore attempted to obstruct justice by tampering with a witness, the offense level was increased by two levels, pursuant to U.S.S.G. § 3C1.1.

(PSR ¶¶ 43-48).

In addition, the Probation Office noted that Gilmore made fraudulent wire transfers from several bank accounts totaling approximately $36,000 during the winter of 2005, and then engaged in a scheme to make fraudulent withdrawals from several bank accounts totaling between approximately $6,000 and $9,000 in June or July of 2005.   (PSR ¶¶ 83, 84).

Because of Gilmore's continued criminal conduct while on bail, the Probation Office did not reduce his offense level pursuant to U.S.S.G. § 3E1.1 for acceptance of responsibility.

9

(PSR ¶ 61).   Accordingly, Gilmore's total offense level was 27.
(PSR ¶ 64).

The Probation Office then determined that Gilmore had
nine criminal history points based on his four prior criminal
convictions and the fact that he committed the charged offenses
while on probation and within two years after his release from
custody on a prior conviction.   (PSR ¶¶ 67-81).   Accordingly,
Gilmore was found to be in Criminal History Category IV.   (PSR ¶
81).   Gilmore's applicable Guidelines range was, therefore, 100
to 125 months' imprisonment.   (PSR ¶ 111).

### 3.   The Sentencing Submissions

In advance of sentencing, counsel for Gilmore submitted
a letter dated September 14, 2006.[4]   In that letter, Gilmore
objected to the Probation Office's application of an aggravating
role adjustment to him.   He also argued that Gilmore should be
awarded a downward departure for acceptance of responsibility in
light of the fact that he did in fact provide information about
others and testify at the trial of John and Duc.   Furthermore,
invoking United States v. Booker, 543 U.S. 220 (2005), and 18
U.S.C. § 3553(a)(2)(A), Gilmore also urged the District Court to
sentence him below his applicable Guidelines range in light of

---

[4] A copy of defense counsel's sentencing letter is annexed to
this Memorandum as Exhibit C.

the fact that others involved in the NYCERS scheme received sentences well below the 100 to 125 month range.  In this letter, defense counsel conceded that Gilmore had engaged in further illegal activity while released on bail.

The Government responded to Gilmore's sentencing submission by a letter dated October 4, 2006.  In its submission, the Government argued that, in light of Gilmore's own testimony during the John and Duc trial that the NYCERS scheme was his idea and that he employed at least four recruiters as well as over 120 accomplice account holders, the four-level aggravating role adjustment should apply.  The Government also argued that Gilmore's post-plea criminal conduct undermined any claim to a reduction in his offense level for acceptance of responsibility. The Government further argued that, in light of Gilmore's role in the NYCERS scheme and his post-plea criminal conduct, Gilmore should be sentenced within his applicable Guidelines range.

4.   **The Sentencing**

On December 4, 2006, Gilmore appeared before this Court

for sentencing.[5]  The Court first gave defense counsel the

opportunity to present any objections to the PSR, and counsel

stated that he had no objections other than those presented in

his sentencing submission of September 14, 2006.  (Tr. at 2-3).

The District Court then asked Gilmore whether he wished to make a

statement, and he did so, stating that he had been "running with

the wrong crowd" and that he had since "burned these bridges"

with that crowd.  (Tr. at 3).  Neither Gilmore nor his attorney

attempted to dispute the fact that Gilmore continued to engage in

criminal conduct involving bank fraud following Gilmore's guilty

plea while he was released on bail, nor did they challenge the

Government's decision not to move for a downward departure for

Gilmore under U.S.S.G. § 5K1.1.

This Court then made an explicit finding that Gilmore

was "a leader or organizer of the [charged] criminal activity"

and, based on his "post-allocution conduct," that "he did not

accept responsibility for his crimes."  (Tr. at 6).  As a result,

the Court adopted the factual recitations set forth in the PSR

and that Gilmore's offense level was 27 and that his Criminal

---

[5] A copy of the Sentencing Transcript is annexed to this
Memorandum as Exhibit D.

History Category was IV, with a resulting Sentencing Guidelines range of 100 to 125 months' imprisonment. (Tr. at 6-7). After considering the various sentencing factors under Title 18, United States Code, Section 3553(a), this Court sentenced Gilmore to a term of imprisonment of 120 months, to be followed by a term of supervised release of five years, and imposed restitution in the amount of $15,920, and a mandatory $100 special assessment. (Tr. at 7). This Court also ordered forfeiture in the amount of $312,131.57. (Tr. at 8).

**G.   The Appeal**

Gilmore filed a timely appeal, challenging his conviction and sentence on three grounds. First, he contended that the Government breached its Cooperation Agreement with Gilmore by refusing to move for a downward departure pursuant to U.S.S.G. § 5K1.1, despite his alleged substantial assistance to the Government in the prosecution of others. Second, he argued that his counsel was constitutionally ineffective for failing to request an evidentiary hearing on the issue of the Government's refusal to move for a § 5K1.1 downward departure. Third, Gilmore challenged as unreasonable the sentence imposed by this Court.

In response, the Government argued that Gilmore had forfeited his first argument -- that the Government had breached the Cooperation Agreement -- because he failed to raise it before

13

this Court.  In the alternative, the Government argued that it had acted in good faith in declining to move for a § 5K1.1 downward departure after Gilmore violated the terms of the Cooperation Agreement by committing additional crimes after entering into that agreement.  With respect to Gilmore's ineffective assistance of counsel argument, the Government maintained that there was no basis to seek an evidentiary hearing in light of the undisputed fact that Gilmore engaged in further illegal conduct.  Finally, the Government argued that Gilmore's 120-month sentence, a sentence within the advisory Guidelines range, was both procedurally and substantively reasonable.

Gilmore's conviction was affirmed by the Court of Appeals in a summary order issued on July 18, 2008.[6]  That Court rejected Gilmore's allegation that the Government breached the Cooperation Agreement, holding that it was "pellucidly clear that the government did not act in bad faith in determining that [Gilmore] had failed to abide by the Agreement and to provide substantial assistance to the government."  United States v. Gilmore, No. 06-5915-cr, at 2 (2d Cir. July 18, 2009). With respect to Gilmore's ineffective assistance of counsel claim, the panel left "resolution of this issue to a future section 2255

---

[6] A copy of the Court of Appeal's decision is annexed to this Memorandum as Exhibit E.

motion." Id. at 3.  Finally, the panel rejected Gilmore's challenges to his sentence, holding that (1) there was no basis to disturb the District Court's decision not to depart downward for substantial assistance, (2) sufficient foundation supported the District Court's decision that Gilmore had not accepted responsibility for his conduct, and (3) Gilmore was "not similarly situated to his co-conspirators" and, even if there were disparities between co-defendants, the District Court need not take them into account at sentencing.  Id.

Gilmore now brings this motion pursuant to Title 28, United States Code, Section 2255 to vacate, set aside or correct his sentence.

## DISCUSSION

In his motion, Gilmore argues that he received ineffective assistance of counsel in violation of his Sixth Amendment right to counsel.  He contends that (1) defense counsel should have requested a hearing on the veracity of Gilmore's testimony at the trial of his co-conspirators; (2) defense counsel should not have conceded that Gilmore committed further crimes while on bail; (3) defense counsel should have attended a proffer session between Gilmore and the Government; and (4) defense counsel failed to make certain arguments at sentencing.

For the reasons set forth below, Gilmore's motion is devoid of merit.

## A.    Legal Standard

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two part test to determine whether defense counsel's assistance was ineffective in violation of the Sixth Amendment.  First, the defendant must show that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  Id. at 691-92.  Second, the defendant must show that he suffered prejudice as a result of defense counsel's deficient performance.  Id. at 689.  In this context, prejudice is established where "there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different."  Id. at 694; see also United States v. Venturella, 391 F.3d 120, 135 (2d Cir. 2004) ("In order to establish a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient such that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment; and (2) the deficient performance prejudiced the defense, such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (citing United States v. Morris, 350 F.3d 32, 39 (2d Cir. 2003)). The burden is on the defendant to establish

both elements.  <u>Strickland</u>, 466 U.S. at 687.  "'In applying [the ineffective assistance] standard, a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  <u>Venturella</u>, 391 F.3d at 134 (quoting <u>United States</u> v. <u>Gaskin</u>, 364 F.3d 438, 468 (2d Cir. 2004)).  Therefore, defense counsel's strategic decisions will not support an ineffective assistance claim, so long as they were reasonably made.  <u>See Stickland</u>, 466 U.S. at 689 ("[T]e defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (internal quotation marks omitted)); <u>United States</u> v. <u>Smith</u>, 198 F.3d 377, 386 (2d Cir. 1999) (rejecting ineffective assistance claim where defense counsel's decisions not to offer or challenge certain evidence were tactical).

**B.    Trial Counsel's Decision Not To Request a Hearing on Whether Gilmore Had Provided False or Misleading Testimony**

Gilmore charges defense counsel with ineffectiveness for not requesting "an evidentiary hearing to resolve the issue of whether [Gilmore's] testimony before Judge Lynch was perjurious, or at minimum misleading to the jury, and to compel the Government to file a [§]5K1.1 letter."  Aff. of James Gilmore dated Dec. 4, 2008 ("Gilmore Aff.") at ¶ 15.

Defense counsel cannot be faulted for not requesting such a hearing, however, because the veracity of Gilmore's testimony against his co-conspirators had no bearing whatsoever on whether Gilmore breached his cooperation agreement.  As set forth above, it was Gilmore's post-plea criminal activity -- activity that Gilmore has never denied -- that constituted the breach of his plea agreement.  This illegal activity, not the content of Gilmore's testimony, caused the Government to decline to file a § 5K1.1 motion on Gilmore's behalf.  An evidentiary hearing on the substance of Gilmore's testimony would have been pointless.

The Second Circuit's resolution of Gilmore's appeal illustrates how the truthfulness of Gilmore's testimony was irrelevant to the Government's decision not to file a § 5K1.1 motion.  As that Court observed, "after signing the [Cooperation] Agreement but before testifying against two alleged co-conspirators, [Gilmore] committed similar crimes of fraud with another cooperating witness yet did not disclose this to the government until after the co-conspirators' trial had been completed."  United States v. Gilmore, No. 06-5915-cr, at 2 (2d Cir. July 18, 2009).  This breach of the Cooperation Agreement "severely prejudiced" the Government because it resulted in the vacatur of a co-conspirator's conviction "once it was discovered

that [Gilmore] engaged in undisclosed, similar criminal conduct with a cooperating witness just prior to the trial." Id. at 2-3. Whether Gilmore testified truthfully against his co-conspirators was beside the point.  Indeed, the Second Circuit found it "pellucidly clear" that the Government was within its rights not to file a § 5K1.1 letter without even considering the veracity of Gilmore's testimony against his co-conspirators.  Id. at 3.

Because the accuracy of Gilmore's testimony has never been relevant to the filing of a § 5K1.1 letter in this case, Gilmore's trial counsel cannot be faulted for not requesting an evidentiary hearing on the matter.  The failure to make frivolous requests or file futile motions does not run afoul of the "objective standard of reasonableness" established in Strickland. See, e.g., United States v. Boothe, 994 F.2d 63, 68-69 (2d Cir. 1993) (holding that trial counsel exercised sound professional judgment by declining to make frivolous motion and rejecting Strickland claim); United States v. Caputo, 808 F.2d 963, 967 (2d Cir. 1987) (same).  This claim of ineffectiveness, therefore, fails to satisfy the first prong of Strickland.

This claim also fails to satisfy the second prong of Strickland.  Had an evidentiary hearing on the veracity of Gilmore's testimony been held, the outcome would have had no bearing on the Government's decision to hold Gilmore in breach of

19

the Cooperation Agreement.   In light of the irrelevance of the
outcome of a hearing on the content of Gilmore's testimony,
Gilmore suffered no prejudice from the absence of such a hearing.
Accordingly, he cannot satisfy the second prong of Strickland
either.

## C.   Trial Counsel's Admission that Gilmore Had Engaged in Further Criminal Conduct

Gilmore also faults his defense counsel for conceding
that he engaged in further criminal conduct after signing the
Cooperation Agreement.   Gilmore Aff. ¶ 18.   Gilmore maintains
that he "never authorized" defense counsel to make this
admission.   Id.

Assuming arguendo that this admission was indeed
unauthorized, Gilmore has failed to show that trial counsel erred
by making it.   Gilmore has never disputed that he did, in fact,
engage in additional fraudulent conduct after entering into the
Cooperation Agreement with the Government.   That question of fact
was not contested before this Court at sentencing, including
during Gilmore's statement to the Court; nor was it contested on
appeal.   Indeed, in his § 2255 petition, Gilmore does not even
imply, much less state explicitly, that he avoided further
criminal activity after signing the Cooperation Agreement.
Because Gilmore's further illegal activity has never been

contested, there is no basis to fault defense counsel for conceding that fact. See, e.g., Boothe, 994 F.2d at 68-69. Gilmore has therefore failed to satisfy the first prong of Strickland.

Even if such a concession violated the "objective standard of reasonableness" established in Strickland, Gilmore has failed to show that he suffered any prejudice because of it. Gilmore does not argue that he intended to contest the allegations of further misconduct, nor does he contest those allegations now. To the contrary, Gilmore admitted to the Government that he had engaged in further illegal activity in violation of the Cooperation Agreement. In light of Gilmore's own admission, the concession of defense counsel hardly broke new ground and was harmless insofar as it simply reiterated Gilmore's prior admission. Because the fact of Gilmore's further misconduct has never been contested, defense counsel's concession simply adopted the undisputed facts of the case. Even without that concession, there would have been no basis in the record to doubt that Gilmore had, indeed, engaged in further illegal conduct. The concession was therefore superfluous and caused no prejudice to Gilmore's case. Accordingly, this error, insofar as the concession might constitute an error, does not violate the second prong of Strickland.

D.   **Trial Counsel's Decision Not To Attend Meetings between Gilmore and the Government**

Gilmore faults his trial counsel for not attending a proffer session with the Government to determine whether Gilmore had engaged in further illegal conduct in violation of the Cooperation Agreement.  Gilmore Aff. ¶ 19.  He contends that defense counsel "never bothered to attend that session despite knowing its purpose" and that they only "briefly confer[red] . . . on the telephone about the subject matter" of the session prior to Gilmore's meeting with the Government.  Id.

Gilmore has failed to explain, much less establish, how he was prejudiced by the absence of defense counsel at the proffer session.  In light of the fact that Gilmore does not contest his further illegal conduct, his options at the proffer session were clear: (1) admit the misconduct, the option he chose, or (2) remain silent.  With the assistance of counsel, Gilmore might have chosen to remain silent.  Had he chosen to do so, however, he would have violated the Cooperation Agreement because he would not have "truthfully and completely disclose[d] all information with respect to the activities of himself and others concerning all matters about which this Office inquire[d] of him."  (Ex. A, Cooperation Agreement at 3).  Regardless of whether he admitted the misconduct or refused to answer the

Government's questions, Gilmore would have breached the
Cooperation Agreement.   Accordingly, the presence of counsel at
the proffer session would have had no impact on Gilmore's breach
of the Cooperation Agreement and the resulting decision of the
Government not to file a § 5K1.1 motion on Gilmore's behalf.
Accordingly, Gilmore cannot satisfy the prejudice prong of
Strickland with this allegation.

E.   **Trial Counsel's Alleged Failure To Make Certain Sentencing
     Arguments**

          Gilmore contends that his defense counsel "refused to
object" to the recommendation of the Probation Office that he
receive (1) a leadership enhancement and (2) no credit for
acceptance of responsibility.   Gilmore Aff. ¶ 20.   Gilmore also
alleges that defense counsel "refused to advise" the Court that a
co-defendant was sentenced to only one year and one day
imprisonment.   Id. at ¶ 21.

          Gilmore's assertions are contradicted by the record:
defense counsel's submission of September 14, 2009 contains all
of the sentencing arguments that Gilmore faults his attorney for
not making.   First, defense counsel urged the Court to "decline
to apply the U.S.S.G. section 3B1.1(a) enhancement (finding that
Mr. Gilmore was an organizer or leader of the bank fraud
scheme)."   (Ex. C, Sentencing Letter, at 1).   Second, defense

counsel advocated for a "three level downward departure for acceptance of responsibility, despite [Gilmore's] criminal conduct while free on bail." (Id. at 2).  Third, defense counsel pointed out that Kenson Kunte, a co-defendant "who began cooperating with the government after Mr. Gilmore," was sentenced to "one year and one day in prison." (Id. at 4).  Every argument that Gilmore faults his defense counsel for not making at sentencing was, in fact, made by defense counsel in the September 14, 2009 submission.  Accordingly, Gilmore's allegations of ineffectiveness arising from defense counsel's advocacy at sentencing have no basis in the record.

**CONCLUSION**

For the reasons set forth above, the defendant's motion should be denied without a hearing.

Dated:      New York, New York
            December 2, 2009

                        Respectfully submitted,


                        PREET BHARARA
                        United States Attorney for the
                        Southern District of New York

                  By:   _____
                        Justin Anderson
                        Assistant United States Attorney
                        (212) 637-1035


cc:  B. Alan Seidler, Esq.
     (via ECF and first class mail)